# United States Bankruptcy Court, Northern District of Illinois

| Name of Assigned Judge | Manuel Barbosa | CASE NO. | 07-B-71375 |
|---|---|---|---|
| DATE | September 14, 2011 | ADVERSARY NO. | 09-A-96131 |
| CASE TITLE | Gluth Bros. Construction, Inc., Debtor<br><br>Charles Dixon and Charles Graeber, Jr., not in their individual capacities but solely as Trustees of the Gluth Bros. Construction, Inc. Creditor Trust, Plaintiff<br><br>v.<br><br>Frank Gluth, Defendant. | | |

**DOCKET ENTRY TEXT**

For the reasons set forth below, the Plaintiff's first and second applications for fees and costs against American Community Bank and Trust are granted, but shall be reduced to $32,440.90 in fees and $1,125.47 in costs. The Plaintiff is granted until September 28, 2011, to submit a more detailed itemization of the Westlaw charges, and the hearing shall be continued for status on that issue to October 5, 2011 at 10:30 a.m.

■[ For further details see text below.]

## OPINION

I.     FACTUAL BACKGROUND

On June 8, 2011, this Court issued a memorandum opinion and order granting the Creditor Trustees' motion to compel American Community Bank and Trust (the "Bank") to release its mortgage on certain land originally owned by the Defendant, Frank Gluth, that had been transferred to the Creditor Trust in partial satisfaction of its judgment against Mr. Gluth. The June 8th memorandum opinion detailed the primary facts and legal issues, which will not be repeated here. The order granting the Creditor Trustees' motion also granted

them attorneys' fees and costs, and set forth a briefing schedule for the Creditor Trustees' counsel, Freeborn & Peters LLP ("Freeborn"), to file an application for fees. Freeborn filed their initial fee application on June 22, 2011. They also filed a fee application on June 29, 2011, for fees in a separate but parallel motion to compel against the Bank. On June 3, 2011, just before the Court ruled on the first motion to compel, the Creditor Trustees had filed a parallel motion to compel against the Bank on a different mortgage on a different property. After the Court ruled on the first motion to compel, the parties acknowledged that the ruling effectively determined the outcome of the second motion, since the issues were identical. However, the parties did not immediately agree on the wording of a proposed order and the order on the second motion was not actually entered until August 19, 2011. That order also provided for attorneys' fees upon proper application. Anticipating that the issue of attorneys' fees would overlap between the two motions to compel, the Court had asked Freeborn to file an application for fees in connection with the second motion and allowed the Bank to respond jointly to both applications. The Bank filed its combined response to both applications on July 13, 2011, Freeborn filed a reply on July 29, 2011, and the Court heard oral argument on the two fee applications on August 17, 2011.

Freeborn seeks $40,759.71 in attorneys' fees and costs in connection with the first motion to compel and an additional $3,798.66 in attorneys' fees and costs in connection with the second motion to compel. The Bank has raised numerous objections to the fee applications, arguing that the request is unreasonable. In particular, the Bank argues that it was unreasonable to spend time preparing the second motion to compel during the time that the Court had taken the first motion to compel under advisement. The Bank also argues that travel time from Chicago to Rockford should not be billed at the full hourly rate, that it was unreasonable to have multiple attorneys appear at hearings, that Mr. Shapiro's hourly rate of $463.50 per hour was unreasonable, that the costs incurred for Westlaw research were excessive and unsupported, and that certain time entries were either not related to the motions to compel or were excessive.

II.    STANDARD

The source of Freeborn's right to reimbursement of attorneys' fees and costs from the Bank in this case is the Illinois Mortgage Act, which provides that if a mortgagee of real property fails to comply with the statute, such mortgagee is liable for a penalty of $200 plus "reasonable attorney's fees." 765 Ill. Comp. Stat. Ann. 905/2 (West 2011). Therefore, the standard for evaluating the fee application in this case is not necessarily the same as the standard this Court uses in evaluating fee applications of professionals retained under Section 330 of the Bankruptcy Code. Cf. In re Geraci, 138 F.3d 314, 320 (7th Cir. 1998) (noting that Congress expressly gave bankruptcy courts the power to evaluate and reduce fees of officers of the estate or debtors' attorneys in Sections 329 and 330 and, in contrast to non-bankruptcy fee litigation, "Congress placed limits on the role the market will be permitted to play in setting professional fees in bankruptcy cases").

In Illinois, as a general matter, the "party seeking fees bears the burden of presenting sufficient evidence from which the trial court can render a decision as to their reasonableness." Gambino v. Boulevard Mortg. Corp., 398 Ill. App. 3d 21, 66, 922 N.E.2d 380, 422 (Ill. App. Ct. 2009) (citing Kaiser v. MEPC Am. Props., Inc., 164 Ill. App. 3d 978, 983, 518 N.E.2d 424 (Ill. App. Ct. 1987)). To meet this standard, the movant must "provide the court with sufficient information as to their reasonableness," including specification of "the

services performed, by whom they were performed, the time expended thereon and the hourly rate charged therefor." Id. (internal citations omitted).

While Freeborn argues that the fee shifting provision in the Illinois Mortgage Act is intended to discourage bad behavior by banks and to remove barriers or disincentives for homeowners to sue, it is important to note that the provision is not a *carte blanche* for attorneys to run up a bill. The statute expressly limits recovery to only fees that are "reasonable." In analyzing a similar provision in the Illinois Workers' Compensation Act, one Illinois court has emphasized that the "legislature has seen fit to grant the circuit court discretion in determining the amount of those fees and costs, namely, that they be 'reasonable.'" Radosevich v. Indus. Comm'n, 367 Ill. App. 3d 769, 777, 856 N.E.2d 1, 8 (Ill. App. Ct. 2006). Therefore, a fee application may be unreasonable if it is "far out of proportion to any sanction or penalty that should be awarded against the respondent under these facts." Id. 367 Ill. App. 3d at 776, 856 N.E.2d at 7 (quoting Kleiboeker v. Indus. Comm'n., 236 Ill. App. 3d 1020, 1027, 602 N.E.2d 912, 917 (Ill. App. Ct. 1992)). On the other hand, "attorney fees may be reasonable even if the fees are disproportionate to the monetary amount of an award." J.B. Esker & Sons, Inc. v. Cle-Pa's P'ship, 325 Ill. App. 3d 276, 283, 757 N.E.2d 1271, 1277 (Ill. App. Ct. 2001). In making a determination as to reasonableness, "the court may look to various factors including: (1) the skill and standing of the attorney, (2) the nature of the case, (3) the novelty of the issues involved, (4) the significance of the case, (5) the degree of responsibility required, (6) the customary charges for comparable services, (7) the benefit to the client, and (8) the reasonable connection between the fees sought and the amount involved in the litigation." Id. (citing Mercado v. Calumet Fed. Sav. & Loan Ass'n, 196 Ill.App.3d 483, 493, 554 N.E.2d 305, 312 (1990)); Gambino v. Boulevard Mortg. Corp., 398 Ill. App. 3d 21, 66-67, 922 N.E.2d 380, 422 (Ill. App. Ct. 2009). The Seventh Circuit Court of Appeals has noted that "hours that an attorney would not properly bill to his or her client in the private sector cannot properly be billed to the adverse party under a fee-shifting statute." Spegon v. Catholic Bishop of Chicago, 175 F.3d 544, 552 (7th Cir. 1999). Counsel asking for reasonable fees under a fee shifting statute should exercise "billing judgment" in making such request, and should "exclude from a fee request hours that are excessive, redundant, or *otherwise unnecessary*." Id. (citing Hensley v. Eckerhart, 461 U.S. 424, 434 (1983)).

III.   CONCESSIONS

Freeborn has conceded that $516.15 in its application was for time related to other matters in the bankruptcy case that was mistakenly included in the fee application, and has agreed to subtract that amount from their application. Additionally, while not agreeing with the Bank's objection to $620.55 in fees for 3.3 hours spent preparing several letters, Freeborn agreed to forego their request for that amount, and to reduce the fee application by $620.55.

IV.   BILLING RATE

Given the context and nature of the case, the Court cannot say that the hourly rate for the Creditor Trustees' counsel was unreasonable, including Mr. Shapiro's rate of $463.50. Generally, "so long as the rates being charged are the applicant's normal rates charged in bankruptcy and nonbankruptcy matters alike, they will be afforded a presumption of reasonableness." In re Spanjer Bros., Inc., 191 B.R. 738, 755 (Bankr. N.D. Ill.

1996) (Squires, J.); see also In re Geraci, 138 F.3d at 320 ("market rates generally are considered presumptively reasonable in [non-bankruptcy] fee litigation in this circuit"). Mr. Shapiro represented to the Court that his fee was no greater than what he normally charged clients in private practice and was even a 10% discount from his usual rate. Furthermore, this Court has previously approved his rate for work performed on behalf of the Creditor Trust in fee applications in the bankruptcy case.

V.     APPEARANCE OF MULTIPLE ATTORNEYS

At a number of hearings on the motions to compel, Freeborn had two counsel appear, Brian Jackiw and John Shapiro. Although in many situations it may be excessive or unreasonable to have multiple attorneys appear at a hearing – particularly a routine status hearing – there are other situations where it may be reasonable to do so. It can be more cost-effective to have multiple attorneys work on a matter, particularly where junior associates bill at a much lower rate. Because of this, there may be situations in which it is best and most efficient for a second attorney to attend a hearing. The hearings at issue here included argument and were not merely routine status hearings. Under the circumstances I will allow Mr. Jackiw's time entry for preparation for and appearance at the hearings that Mr. Shapiro also attended. However, since only one lawyer per party may normally present arguments, I do not believe it was reasonable to have the second attorney drive all the way out to Rockford for the hearings at which both Mr. Shapiro and Mr. Jackiw attended in person. Mr. Shapiro was the attorney who presented argument before the Court on the dates set for oral argument. If it was necessary for Mr. Jackiw to hear what was said at argument rather than simply receive a summary report from Mr. Shapiro, he could have scheduled a telephonic appearance to listen to the hearing. While I do not usually allow telephonic appearances by the attorney presenting argument for hearings specially set for oral argument, a second attorney could schedule a telephonic appearance to passively listen to the hearing, as Mr. Jackiw did for the June 8, 2011 hearing. Therefore, I will strike Mr. Jackiw's time for traveling to the hearings on March 30, 2011, and April 27, 2011. I will also strike the $118.93 mileage/parking reimbursement expense for Mr. Jackiw for March 30 but will offset it by the $30 which he would have otherwise had to incur to appear telephonically.[1] This results in a reduction of $2,725.03.[2]

VI.    TRAVEL TIME

The Seventh Circuit Court of Appeals has stated that it is appropriate to grant attorneys' fees for travel time, since, even if the attorney is not performing legal work while travelling, the attorney must forgo the 'opportunity cost' of representing other clients during that travel. See, e.g., In re Maurice, 69 F.3d 830, 834 (7th Cir. 1995); Henry v. Webermeier, 738 F.2d 188, 194 (7th Cir. 1984). In private practice, lawyers frequently charge their clients for travel time "and usually at the same rate they charge for other time, except when they are

---

[1] Mr. Jackiw did not request a mileage or parking reimbursement for April 27, 2011. From reviewing the call sheet from that day, that may be because Mr. Jackiw appeared on other Gluth Bros. related matters that day, and presumably charged the mileage to the Creditor Trust. The fact that Freeborn attorneys may have appeared on multiple Gluth Bros. matters on a single hearing date also puts into doubt the propriety of charging the entire travel time to the American Community Bank matter. However, since the Bank did not raise this issue, I will give Freeborn the benefit of the doubt that the appearance in person of at least one attorney was on account of the American Community Bank matter. Since at least one of the hearings was specially set for oral argument, for which arguing attorneys are not allowed to appear telephonically, that is at least true for one of the hearings.

[2] This is 10.1 hours at $261/hour plus $118.93 minus $30.

able to bill another client for part of the travel time." Henry, 738 F.2d at 194. Therefore, there is "a presumption ... that a reasonable attorney's fee includes reasonable travel time billed at the same hourly rate as the lawyer's normal working time." Id. Mr. Shapiro represented to the Court that Freeborn normally charges clients for travel time, though he admitted that certain clients may refuse to pay for travel and such clients negotiate the issue specifically beforehand at the time of engagement.

This Court recognizes the lost opportunity cost of travel time, and therefore regularly allows it, but in bankruptcy matters I usually only allow it only at one half the attorney's usual billing rate. See, e.g., In re Planter, No. 08-B-16883, 2009 WL 1393691 (Bankr. N.D. Ill. May 18, 2009). This reduction is essentially a compromise which recognizes that, while debtors and other parties are free to retain out-of-town counsel from places such as Chicago, and such counsel are free to represent clients in this area, the fact that an out-of-town firm has been retained tends to increase travel expenses, and those increased expenses frequently get passed on to the client. By cutting the fees in half, the client pays for at least a portion of the attorney's actual lost opportunity cost while forcing the firm to share a portion of that cost as a cost of doing business for a distant client. This also makes sure there is an incentive for the attorney to economize on travel expenses rather than 'running up the bill' through travel. If the attorney will not earn his full hourly rate for travel, he may consider using local counsel to step up on routine matters or consider sending only a single attorney rather than more than one to hearings. I also allow out-of-town attorneys to appear telephonically on regular status calls, which also helps reduce travel costs.

Freeborn suggests that this policy should be limited to approval of bankruptcy-related fees, where the Court has greater discretion to cut fees. In bankruptcy-related matters, the Court needs to protect the interests of creditors in a distribution of limited assets, and creditors may have little say in the choice of counsel for a debtor-in-possession or for a trustee, or little say in negotiating the terms of engagement. However, whether or not as a general matter it is appropriate to limit fees for travel time under the Illinois Mortgage Act, the Court finds that under the circumstances Freeborn is only entitled to half their usual rate for travel time. Fee shifting statutes, or at least those fee shifting statutes that include a "reasonable" qualifier, are not intended to give counsel for prevailing parties a better deal than they would have gotten from their own client. Here, the original retention of Freeborn as counsel for the Creditor Trust was in the context of the bankruptcy case, and because of this Court's long-standing policy they only had an expectation that they would be entitled to charge for travel at half their customary rate. Henry makes clear that the presumption of a right to full rate travel time is only a presumption, and that it is based on the actual or hypothetical arrangement with a client in private practice. As noted above, Spegon also makes clear that fee shifting statutes for "reasonable" fees only shift fees that an attorney would properly bill to a client in private practice. 175 F.3d at 552. Freeborn admitted that it sometimes agrees to less than full reimbursement for travel time when it enters into retention agreements with clients in the private sector. That is essentially what happened here, where Freeborn was retained as counsel for the Creditor Trust with knowledge that the Court would not approve travel time to court hearings for more than half the firm's customary billing rates. Presumably the Creditor Trustees asked Freeborn to represent them in connection with this related matter because Freeborn was already familiar with the facts and issues surrounding the mortgages and real estate through their representation of the Creditor Trust in purely bankruptcy-related matters. In such circumstances, I cannot believe that a client in the private sector who had demanded a cap on

travel time for bankruptcy matters would suddenly agree to pay the full rate for travel time on a related matter simply because it related to the Illinois Mortgage Act rather than the Bankruptcy Code. Perhaps that might be the case if the Mortgage Act issue would require more travel, but here it was heard in the same bankruptcy court as the usual bankruptcy matters. Therefore, it appears that Freeborn is simply asking for the full rate because of the fee shifting statute, which is not an appropriate request.

Finally, as I noted in the previous section, I have some concern that at least on some of the hearing dates on the American Community Bank matter Freeborn attorneys were appearing in court in connection with other Gluth Bros. related matters as well. If this is so, it would not seem appropriate to charge the entire travel time to the American Community Bank matter. This concern also tends to support reducing the travel time by half. Therefore, for the remaining travel time the Court will limit the application for travel time to half the attorneys' customary billing rate. This results in a reduction of $3,317.63.[3]

VII.   COMPUTERIZED RESEARCH

The Bank correctly objects that Freeborn gave an insufficient description of their computerized legal research to properly support their fee application. The itemization provided by Freeborn simply lists a date, an amount, an attorney's name and an entry of "Computer Legal Research – Westlaw." This is exactly the sort of vague entry that Judge Pallmeyer found insufficient in Dupuy v. McEwen, 648 F. Supp. 2d 1007, 1031 (N.D. Ill. 2009) (entries that "read simply as 'Lexis–Nexis' or 'Westlaw online legal research charges,' and provide a date" were not "documented adequately enough to allow recovery"). Freeborn suggests that the Court could have looked to the corresponding date in the attorneys' time entries for more detail, but as Judge Pallmeyer noted, courts and opposing counsel are not "responsible for combing through these various ledger entries and making educated guesses as to what legal research was performed on various dates, and whether the amount charged for that research is reasonable." Id. Moreover, in this case even the time entries do not give sufficient detail. Three of those entries simply state "research regarding issues for reply in support of motion to compel release of mortgage." While applicants are not required to submit highly detailed lists of costs or to provide detail to a level that could jeopardize attorney-client confidentiality or reveal work product, more detail than this is required. Elsewhere in the time itemization Freeborn attorneys demonstrate that they are able to give more detail on the subject and type of legal research. For example, one entry states, "Research mortgage laws relevant to release, satisfaction, and penalties for failure to release," and another states, "Research lender's obligation to release mortgage." However, these entries predate the dates for the Westlaw charges and are by other attorneys, so they cannot be related. Additionally, even if the Court were to look to the time entries, there is no corresponding entry of attorneys' time for the March 21st Westlaw charge. Freeborn argues that the charge must have been for a quick search which did not take long enough for the attorney to separately charge for his time. But that also means no information was provided to the Court about the type or subject of the

---

[3] This is half of Mr. Jackiw's rate of $261/hour for the March 9 hearing of 5 hours traveling and half of Mr. Shapiro's rate of $463.50/hour for the March 30, April 27 and June 8 hearings, totaling 11.5 hours traveling. Mr. Shapiro's March 30, 2011, itemization indicates that 2.0 hours was spent travelling to the hearing, but that the travel time included some conferences and preparation on the way. The itemization does not indicate what proportion of that travel time was spent working (for which he would be entitled to the full rate) and what proportion was spent traveling (for which he would only be entitled to a half rate). I will treat the entry as indicating half the travel time, or 1.0 hour, was spent doing work.

research, giving the Court no way to determine if it was related or necessary. Freeborn argues that the attorney knew the Westlaw charge was related because he inserted a client/matter number at the time of the search, which was reflected on the invoice. But, as Judge Pallymeyer noted, an additional danger where attorneys rely solely on a client/matter number is that "vague entries are actually in reference to work performed on other cases" or other issues. Id. 648 F. Supp. 2d at 1031. Therefore, the Court will not grant the request for reimbursement of Westlaw charges, and will deduct $1,438.55 from the application. However, this holding is without prejudice to Freeborn's right to file more detailed documentation or support for the Westlaw charges on or before September 28, 2011. The Court will continue the status hearing on that issue alone to October 5, 2011 at 10:30 a.m.

### VIII. OTHER OBJECTIONS:

I will also cut the attorney's fees related to the second motion to compel in half, to $1,838.70. I agree with the Bank that the timing of the second motion – after the first motion had been fully briefed and argued and on the eve of the date this Court had set for ruling on the first motion – seems almost like a last-chance effort to run up the bill. Certainly it must have been obvious that waiting until the Court ruled on the first motion would have reduced the fees incurred in working on the second motion. If the Court ruled against the Creditor Trustees on the first motion, there would have been no need to file the second motion. If the Court ruled against the Bank, the Bank would likely voluntarily comply and release the second mortgage, or if the Creditor Trustees still had to prepare a motion, it would have been much simpler to do so after the Court's ruling, because they could have simply referred to the Court's ruling on the first motion. The itemization shows that all of the work on the second motion was done less than a week before the date the Court had set for ruling on the first motion. While the Creditor Trustees had the right to file the second motion, they have suggested no reason why they would have suffered any prejudice in waiting a few days, until after the Court's scheduled ruling, to prepare and file it. Such lack of prejudice, when weighed against the substantial savings from waiting a week, shows that the full amount of fees that Freeborn seeks were not reasonable. However, I do not agree with the Bank's contention that the fees on the second motion should be denied in full. I acknowledge that at least a portion of the fees related to analyzing the mortgage documents and status of the property, which were factually different from the property and mortgage related to the first mortgage. Also, even if the Creditor Trustees had waited until after the Court's ruling, they still might have had to prepare a motion to compel, though it would have been much simpler after the Court's ruling. From reviewing the itemization of time spent on the second motion, I find that only half the time spent on the second motion was reasonable.

Finally, I will cut $545.40[4] for time spent preparing several blow-ups of exhibits that Freeborn apparently prepared for oral argument but never used. The matter was set for oral argument, not an evidentiary hearing, and I do not see how blow up exhibits would have been useful for the Creditor Trustees' argument. The dispute before the Court was over the interpretation of the mortgage and interpretation of a statute, not a

---

[4] This reflects 1.7 hours of work by Henley Clement, a paralegal, and 0.5 hours of work by Mr. Shapiro. The Court was forced to estimate the amount of time spent by Mr. Shapiro from an April 25, 2011, 1.8 hour block entry which stated "Prepare for oral argument ... including preparation of potential demonstratives for hearing ...."

dispute of fact. Therefore, I cannot find that the expenditure of attorneys' time was reasonable under the circumstances.

IX.    CONCLUSION

For the foregoing reasons, the Plaintiff's first and second applications for fees and costs against American Community Bank and Trust are granted, but shall be reduced to $32,440.90 in fees and $1,125.47 in costs. The Plaintiff is granted until September 28, 2011, to submit a more detailed itemization of the Westlaw charges, and the hearing shall be continued for status on that issue to October 5, 2011 at 10:30 a.m.

The foregoing constitutes findings of fact and conclusions of law as required by Fed. R. Civ. P. 52(a) and Fed. R. Bankr. P. 7052. A separate order shall be entered pursuant to Fed. R. Bankr. P. 9021 giving effect to the determinations reached herein.

September 14, 2011

Judge Manuel Barbosa